**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**JENNIFER CARDENAS**                                                              **PLAINTIFF**

**V.**                                                              **NO. 3:14-CV-00036-DMB-JMV**

**HILARY MASLON**                                                              **DEFENDANT**

## OPINION AND ORDER GRANTING SUMMARY JUDGMENT

This removed action is brought by Plaintiff Jennifer Cardenas against her former employer, Defendant Hilary Maslon. Doc. #2. Plaintiff alleges that Defendant wrongfully "instituted criminal felony proceedings" which resulted in damage to Plaintiff. *Id*. Before the Court is Defendant's motion for summary judgment. Doc. #27.

**I
Summary Judgment Standard**

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship,* 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 22–23 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Norwegian Bulk Transp. A/S,* 520 F.3d at 411–12 (internal quotation marks omitted). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id.* at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar

evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998) (citation omitted). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.,* 639 F.3d 186, 191–92 (5th Cir. 2011) (citation and internal punctuation omitted). When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

## II
## Relevant Facts

### A. Defendant's Business

In 2000, Defendant purchased a 213-acre tract of land in Marshall County, Mississippi ("Land"). Doc. #27-6 at ¶ 2. Defendant purchased the property with the intention to establish an "arts retreat" on the Land. *Id.* To this end, also in 2000, Defendant established a 501(c)(3) entity.[1] *Id.* The following year, Defendant established an LLC and named the Land "Silver Ash Ranch" ("Ranch"). *Id.* At the time, Defendant had "[a]bsolutely zero" experience in running a ranch business. Doc. #33-1 at 13.

---

[1] 501(c)(3) organizations are exempt from federal income taxes. *See* 26 U.S.C. § 501. These organizations are "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or education purposes, or to foster national or international amateur sports competition … or for the prevention of cruelty to children or animals." *Id.*

After deciding "that it was important … to attain a Master's degree in Fine Arts in order to properly promote and operate [the] arts residency," Defendant applied for and, in 2005, was accepted into, a Master's program at Queens College in New York City. Doc. #27-6 at ¶ 3. Defendant attended Queens College for a semester but returned to Mississippi "in order to ensure [the Ranch] would be adequately cared [for] and income producing" during her time in New York. *Id*. at ¶ 4.

### B. Defendant's Hire of Plaintiff

Upon her return to Mississippi, Defendant elected to "set the ranch up as a retreat." Doc. #27-6 at ¶ 5. Because Defendant had no experience in operating a retreat, she decided to hire a manager. *Id*. In June 2006, after placing job advertisements in *Caretakers Gazette* and on the Craig's List website, Defendant was contacted by Plaintiff regarding the manager vacancy. *Id*. at ¶ 6. Defendant interviewed and then hired Plaintiff. *Id*. Right around this time, Defendant's bookkeeper was killed in a car accident. Doc. #33-1 at 35.

Under the terms of her employment Plaintiff received: (1) a monthly salary of $500; (2) living accommodations valued at $700 per month; (3) 40% commission on gross receipts of income related to lodging; and (4) $10 per hour for every hour worked per month in excess of 120 hours. Doc. #27-6 at ¶ 9. In return for the compensation, Plaintiff was responsible for a number of duties, including maintenance for the Ranch, assisting in marketing, hiring workers, and "[k]eeping track of the daily financial operations of the [Ranch], including responsibility for handling deposits and paying expenses via checks." *Id*. at ¶ 8.

In relation to Plaintiff's financial duties, Defendant added Plaintiff as a co-signor on the Ranch's bank account at the Bank of Holly Springs, Mississippi. Doc. #27-6 at ¶ 12. Defendant

also authorized Plaintiff "to set up and use a PayPal account … which had been established in the name of [the] Ranch … to conduct business related to the [R]anch." *Id.*

After accepting the job, Plaintiff moved into the provided accommodations with her two children.[2] Doc. #27-6 at ¶ 10. For the first three months of her employment, Plaintiff received training from Defendant as to Defendant's "expectations." *Id.* at ¶ 7.

### C. Defendant's Time In New York

Approximately three months after Plaintiff's hire, Defendant retuned to New York to continue her studies at Queens College. Doc. #27-6 at ¶ 11. From 2006 until 2009, Defendant lived in New York, but "returned to the [R]anch … for summers, holidays and occasional weekends to ensure the ranch was operating accordingly." *Id.* Defendant also "communicate[d] with Plaintiff in an effort to grow and operate the business at the [R]anch." *Id.* Specifically, Plaintiff and Defendant "would frequently email each other regarding the activities, including financial activities, of the ranch." *Id.* at ¶ 14.

During the time she was away, Defendant required that Plaintiff furnish receipts for all expenditures. Doc. #33-1 at 22. Plaintiff would normally keep the receipts in a receipt book in her desk and would provide them to Defendant during Defendant's trips to the Ranch. *Id.* However, on occasion, Plaintiff would mail the receipts directly to Defendant. *Id.* at 22–23.

When Defendant was in Mississippi, she would take over some of Plaintiff's duties, "like going to get gas for tractors or going to get food for the animals …." Doc. #33-1 at 24. On occasion, Plaintiff would have to remind Defendant why Defendant had issued specific checks. Doc. #33-2 at 50.

---

[2] In June 2007, James Smith, the father of one of Plaintiff's children, moved in with Plaintiff and her children. Doc. #33-2 at 58–59.

Although there were some disputes between Plaintiff and Defendant as to Plaintiff's operation and provision of financial updates regarding the Ranch, Defendant "felt that Plaintiff was a good employee and trusted that she would ensure the ranch was taken care [of] during [Defendant's] absences." Doc. #27-6 at ¶ 16.

At some point during 2008, Plaintiff became pregnant and tried to end her employment. Doc. #33-2 at 74. Defendant "gave [Plaintiff] a hard time" and Plaintiff decided to stay. *Id.*

During the winter of 2008 and 2009, Defendant discovered that Plaintiff had used the PayPal account to purchase tickets to Disney World. Doc. #27-6 at ¶ 17. Although Defendant states that this purchase was made without authorization, Plaintiff testified that she had permission to make the purchase. *Id*; Doc. #33-2 at 102. Defendant was "troubled" by what she perceived to be Plaintiff's misappropriation of Ranch funds, but she "had no time to focus on [the incident] without sacrificing [her] degree." Doc. #27-6 at ¶ 18.

At approximately the same time as the purchase of the Disney tickets, Defendant decided to sell the Ranch. Doc. #27-6 at ¶ 18. After placing a listing on the internet, Defendant made arrangements for prospective buyers from Hawaii to visit the property in June 2009. *Id.*

### D. Defendant's Return to Mississippi

In preparation for the prospective buyers, Defendant arranged to return to the Ranch in June 2009 and to have Plaintiff pick her up at the Memphis International Airport. Doc. #27-6 at ¶ 19. In the week leading up to her planned return, Defendant and Plaintiff spoke "multiple times," with Plaintiff "confirm[ing]" the arrangement each time. *Id.*

Sometime in or before June 2009, Plaintiff discovered she was pregnant. Doc. #33-2 at 73. Based on the pregnancy and her general dislike for the job, Plaintiff decided to quit her position. *Id.* Furthermore, because of Defendant's reaction to Plaintiff's previous attempt to

leave the Ranch, Plaintiff elected not to give Defendant notice of her departure. *Id.* at 73–74. However, so as to not leave the Ranch abandoned, Plaintiff decided to leave the morning Defendant was set to arrive from New York. *Id.* Plaintiff testified that when she departed, she left all the receipts she had collected since Defendant had last been at the Ranch. *Id.* at 103–104.

When Defendant landed in Memphis, Plaintiff was not at the airport. Doc. #27-6 at ¶ 20. Thus, Defendant obtained an alternative means of transport to the Ranch.[3] *Id.* When Defendant arrived at the Ranch, she discovered that Plaintiff, and all Plaintiff's belongings, were gone. *Id.* Defendant found the receipt book and observed that "there were very few receipts." Doc. #33-1 at 45. The nature of Plaintiff's departure made Defendant "wholly upset." *Id.* at 105.

Sometime later, Plaintiff informed Defendant that she had quit. Doc. #27-6 at ¶ 21. Plaintiff did not give Defendant a reason for her decision. *Id.*

For "several" weeks after Plaintiff's departure, Defendant attempted to go through the Ranch's finances. Doc. #27-6 at ¶ 23. However, due to the death of her bookkeeper[4] and her "lack of sophistication in bookkeeping," Defendant did not find anything amiss in the financial information. *Id.* Defendant even told Plaintiff that "she was pleased with the state the ranch was in." Doc. #33-2 at 77.

Other than exchanging e-mails in the weeks following Plaintiff's departure, Plaintiff and Defendant "essentially had no contact until approximately December 2009 when [Defendant] began to inquire of [Plaintiff's] employment taxes." Doc. #27-6 at ¶ 24. Throughout this time period, Defendant "had no suspicions… that [Plaintiff] had acted inappropriately with the

---

[3] Plaintiff testified that she had arranged for someone else to take Defendant to the ranch, but that Defendant provided incorrect flight information "so it didn't work out." Doc. #33-2 at 74.

[4] In explaining why she did not have a bookkeeper approximately three years after her bookkeeper's death, Defendant explained, "I went through, like, seven bookkeepers because everyone was … incompetent or had some kind of drama, or they disappeared or whatever." Doc. #33-1 at 35.

finances of the ranch." *Id.* However, Defendant felt that the circumstances of Plaintiff's departure were "very strange." *Id.*

### E.   Defendant's Hire of Gene Ash and Subsequent Review of Finances

In or about February 2010, Defendant hired Gene Ash to work full-time at the Ranch. Doc. #27-6 at ¶ 25. After his hire, Ash, who had worked at the Ranch under Plaintiff in 2009, informed Defendant that Plaintiff "had been stealing money from the ranch." *Id.* Ash explained that "on more than one occasion, Plaintiff would ask [Ash] to lie about work done at the ranch and then … write a wage check (either to him or for 'cash') for the purported work. The check would then be cashed, [Ash] would be given $50.00 and Plaintiff would keep the balance for herself." *Id.*

Defendant did not ask Ash, who she acknowledged was a "pretty serious alcoholic," any details about the scheme. Doc. #33-1 at 34. 78. Rather, Defendant elected to "look[] at [her] books." *Id.* at 34. Defendant also decided to retain Ash as an employee because she "appreciated his honesty [a]nd after that I felt like I trusted him." *Id.*

In or about March 2010, Defendant and a bookkeeper reviewed the financial records of the Ranch. Doc. #27-6 at ¶ 26. During this review, Defendant noticed an "inordinate amount of money written to [Ash, which Defendant] did not feel like [was] an accurate representation of the hours he had actually earned." *Id.* Defendant felt this information "confirmed" Ash's accusations regarding Plaintiff. *Id.* Defendant also "became suspicious" regarding "'cash' check writing activities [for expenses] which would have made much more sense to be written to the seller" and "about payments to individuals for jobs which either did not seem reasonable based [on] the job specified in the payments or did not seem reasonable based [on] what [Defendant] knew to be the activities occurring the during the time the payments were made …." *Id.*

### F.   Criminal Accusation

Sometime in the summer of 2010, Defendant "elected to speak with the Marshall County Sheriff's Department to see if a crime had been committed."  Doc. #27-6 at ¶ 27; Doc. #33-1 at 38.  Defendant was told to speak with Marshall County Investigator David Pannell who, in turn, told Defendant "to bring all the information [she] had pertaining to the questionable transactions to his office."  Doc. #27-6 at ¶ 27.  Defendant took the requested information to Pannell and Tina Karastamaris, another employee at the Sheriff's Department.  *Id*.  According to Defendant, she and Pannell "went over [her] whole bank account" and "it looked like there might have been … close to $10,000 worth [of checks] that were questionable [and] not documented [and] were suspect."  Doc. #33-1 at 108–09.    Defendant understood that Pannell would use the checks to investigate the case.  *Id*. at 108.

Pannell later completed an incident report listing Defendant as complainant and Plaintiff as "defendant."  Doc. #27-5 at 8.  The report stated that "Hilary Maslon, owner of Silver Ash Ranch, reported that the Defendant, Jennifer Cardenas embezzled several thousand dollars …."  *Id*.  The report also stated that "when the complainant was going through the checkbooks, she found several unauthorized checks had been written by the defendant" and that "according to the complainant's records, there were" thirty-nine "unauthorized" checks written between January and June of 2009, which totaled $5,520.10.  *Id*. at 8–9.  According to Defendant, Pannell "determined that these were the checks that looked … suspicious."  Doc. #33-1 at 42.

On January 12, 2011, Pannell asked Plaintiff to "get copies of the back side of the checks in question" and to provide "a detailed statement … on [Plaintiff's] employment duties (starting date, departure date, the checks and amounts she was allowed to write.)."  Doc. #27-5 at 12.  Pannell also contacted Defendant an unspecified number of times to inquire about particular

checks. Doc. #33-1 at 42. Other than the January 12 request and the unspecified number of questions, neither party has presented evidence regarding the scope or nature of Pannell's investigation.[5]

Pannell presented the suspicious checks to Defendant, who failed to "go over some of them in detail." Doc. #33-1 at 62. Defendant concedes that, if she had actually looked at the checks, she "might have pulled some of those out." *Id.* However, she testified that she "relied on [Pannell's] assessment" that the checks were "evidence of embezzlement." *Id.* at 110. At her deposition, Defendant acknowledged that "some" of the checks were valid, and thus not evidence of embezzlement. *See id.* at 61, 72, 113. For example, at least two checks were properly written as compensation Plaintiff earned during her employment. *Id.* at 72, 100.

For the bulk of the allegedly "unauthorized" checks, Defendant concedes that she did not (and does not) have direct evidence that the checks were unauthorized or that the proceeds from the checks were embezzled by Plaintiff. Rather, she claims that the totality of the circumstances surrounding each check justified suspicion. For example, a check may have been suspicious to Defendant if it did not state what it was for and there was no accompanying receipt, Doc. #33-1 at 42, 85; or if it stated it was for "fertilizer and seed" and stamped by a company that did not sell fertilizer or seed, *id.* at 87–88; or if a check was written to Ash for what Defendant deemed an "excessive" amount of hours, *id.* at 94.

### G. Criminal Proceedings

Pannell submitted the criminal case to Christine Tatum, then a district attorney in Marshall County. Doc. #34-1 at ¶ 8. Tatum reviewed the case presented by Pannell and

---

[5] Defendant testified that she was "in on" the investigation, but was "not quite sure how he determined some of [the checks]." Doc. #33-1 at 42, 109.

"believed it was in the best interest of justice for the case to be heard before the Marshall County Grand Jury." *Id.*

Defendant was called to testify before the grand jury about Plaintiff's alleged embezzlement. Doc. #27-6 at ¶ 28. When she testified, Defendant intended to "charge" Plaintiff with embezzlement. Doc. #33-1 at 39. Pannell testified before the same panel. Doc. #27-2.

The thirty-nine checks identified by Pannell as "suspicious" were presented to the grand jury. Doc. #33-1 at 62. However, Defendant could not recall whether she saw the checks during the grand jury process.[6] *Id.*

On October 12, 2011, the grand jury returned a one-count indictment against Plaintiff. Doc. #27-2. The indictment charged that Plaintiff embezzled $5,520.10 from Defendant in violation of Section 97-23-19 of the Mississippi Code. *Id.* An arrest warrant for Defendant was issued the following day. Doc. #27-4. Plaintiff was arrested and, on December 20, 2011, released under a $5,000 appearance bond. *Id.*

After the indictment, Plaintiff met with Tatum regarding the criminal case. Doc. #33-2 at 95–96. Plaintiff told Tatum that she "could provide all the … basis for all the checks with e-mails and letters and stuff." *Id.* Tatum requested, and Plaintiff eventually provided, this information. *Id.*

"Many months" after the indictment, Tatum, while engaged in the criminal discovery process, "reviewed all evidence produced in the case, including new statements from [Plaintiff]

---

[6] In her response brief, Plaintiff argues that Defendant "determined which checks were presented to the grand jury." Doc. #33 at 3 (citing Doc. #33-1 at 42 and Doc. #27-5 at 12). The cited portion of the deposition on which Plaintiff relies for this argument involves a statement by Defendant that Pannell did not have independent knowledge about the checks and that he would ask Defendant if he had a question about a specific check. Doc. #33-1 at 42. The cited document for the argument is the note from Pannell to Plaintiff asking Defendant to provide copies of the check and a statement of Plaintiff's employment duties. Doc. #27-5 at 12. Neither of these pieces of evidence establish that Defendant determined which checks were presented to the grand jury.

refuting the charges." Doc. #34-1 at ¶ 13. While Tatum felt that the information provided by Defendant was "sufficient to support a finding of probable cause," she decided "that it would be difficult to prove [Plaintiff's] guilt … beyond a reasonable doubt." *Id.* at ¶ 14. Thus, on November 14, 2012, Tatum exercised her "prosecutorial discretion" and agreed to dismiss the criminal action. *Id.* at ¶ 15; Doc. #27-3.

### H. This Action

On November 14, 2013, Plaintiff filed a complaint against Defendant in the Circuit Court of Marshall County, Mississippi. Doc. #2. In her complaint, Plaintiff alleged claims of "Negligence and Gross Negligence," "Malicious Prosecution," and "Defamation – Libel and Slander." *Id.* Defendant was served with a summons and copy of the complaint on January 18, 2014, in San Rafael, California. Doc. #1-4.

On February 14, 2014, Defendant removed the state action to this court on the basis of diversity jurisdiction.[7] On November 26, 2014, Plaintiff stipulated to the dismissal, with prejudice, of her claims for negligence, gross negligence, and defamation. Doc. #26.

On November 28, 2014, Defendant filed a motion for summary judgment. Doc. #27. Plaintiff timely responded and Defendant timely replied. Doc. # 33; Doc. #34.

### III
### Analysis

In her motion, Defendant seeks summary judgment on Plaintiff's claim for malicious prosecution – the sole remaining claim in this action. Doc. #28.

The Mississippi Supreme Court has held:

---

[7] Plaintiff's complaint alleges that she is a resident of Tennessee and Defendant is a resident of Mississippi. Doc. #2 at ¶¶ 1–2. Defendant responded that she is a citizen of California. Doc. #1 at 3. The state of Defendant's citizenship is not an issue on summary judgment. Defendant does not dispute or challenge venue.

The elements of the tort of malicious prosecution are: (1) [t]he institution of a proceeding (2) by, or at the insistence of the defendant (3) the termination of such proceedings in the plaintiff's favor (4) malice in instituting the proceedings (5) want of probable cause for the proceedings (6) the suffering of injury or damage as a result of the prosecution. All six of these elements must be proven by a preponderance of the evidence.

*Condere Corp. v. Moon*, 880 So. 2d 1038, 1042 (Miss. 2004). In analyzing these elements, a court should be mindful that "malicious prosecution suits are not favored [and] must be 'managed with great caution.'" *Croft v. Grand Casino Tunica, Inc.*, 910 So.2d 66, 72 (Miss. Ct. App. 2005) (quoting *State ex rel. Foster v. Vurtner*, 319 So.2d 233, 235 (Miss. 1975)).

Defendant argues that summary judgment is warranted because Plaintiff cannot prove: (1) Defendant instituted the criminal proceedings; (2) the criminal proceedings were terminated in Plaintiff's favor; (3) there was a want of probable cause for the proceedings; or (4) that Defendant acted with malice. Doc. #28 at 10.

### A. Institution of Criminal Proceedings

"The law draws a fine line of demarcation between malicious prosecution cases where a party directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute." 52 Am. Jur. 2d Malicious Prosecution § 23.[8] "The test for liability in an action for malicious prosecution is: Was defendant actively instrumental in putting the law in force? In order to sustain the action, it must affirmatively appear as a part of the case of the party demanding damages that the party sought to be charged was the proximate and movant cause of maliciously putting the law in motion …." *Downtown Grill, Inc. v. Connell*, 721 So.2d 1113, 1117 (Miss. 1998). Under this standard, "there must be some affirmative action by way of

---

[8] The Mississippi Supreme Court has relied on an array of secondary sources in developing its malicious prosecution jurisprudence. *See Winters v. Griffis*, 101 So. 2d 346, 348 (Miss. 1958) (citing American Jurisprudence and Corpus Juris Secundum); *see also Stewart v. S.E. Foods, Inc.*, 688 So.2d 733, 736 (Miss. 1996) (citing Restatement (Second) of Torts).

advice, encouragement, pressure, etc., in the institution, or causing the institution, of the prosecution …." *Id*. If the defendant maliciously causes the prosecution, he will be "liable, although he did not actually make or sign the affidavit on which the warrant was issued, or although he was not the prosecutor of record." *Id*.

Of relevance to this case, the Mississippi Supreme Court, quoting Keeton on the Law of Torts, has held:

> The question of information laid before prosecuting authorities has arisen in many cases. If the defendant merely states what is believed, leaving the decision to prosecute entirely to the uncontrolled discretion of the officer, or if the officer makes an independent investigation, or prosecutes for an offense other than the one charged by the defendant, the latter is not regarded as having instigated the proceeding.

*Downtown Grill, Inc.*, 721 So.2d at 1118 (quoting W. Page Keeton et al., Prosser and Keeton, on the Law of Torts § 119 at 872-73 (5th ed. 1984)).  Put another way, "it is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them."  *Benjamin v. Hooper Elec. Supply Co., Inc.*, 568 So.2d 1182, 1189 (Miss. 1990); *see also* Restatement (Second) of Torts § 653 (1977) ("[G]iving the information or even making an accusation of criminal misconduct does not constitute a procurement of the proceedings initiated by the officer if it is left entirely to his discretion to initiate the proceedings or not.")

Of course, a person cannot believe what he knows to be false.  Thus, Mississippi law recognizes that "knowingly giving false information may be an attempt to influence the officer's judgment in deciding whether to effect an arrest [and thus] may be enough to hold the informer liable" *Downtown Grill, Inc.*, 721 So.2d at 1118; *see also* Restatement (Second) of Torts § 653 (1977) ("If, however, the information is known by the giver to be false, an intelligent exercise of

the officer's discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information.").

In short, a private citizen presenting information to prosecuting authorities will *not* be deemed an initiator of a subsequent criminal proceeding if: (1) the citizen states what is believed (i.e., did not knowingly provide false information) and the decision to prosecute was left to the discretion of the prosecuting authorities; (2) the prosecuting authorities conducted an independent investigation; or (3) the plaintiff was prosecuted for an offense other than the one charged by the private citizen.

Here, Defendant argues that she did not initiate the criminal proceeding because she merely presented information to Pannell and that he then "reviewed and investigated the matter." Doc. #28 at 12. Plaintiff responds that the decision to prosecute was not left to Pannell and that Pannell's investigation "was not an independent investigation initiated by law enforcement, but instead was initiated and fueled by Maslon." Doc. #33 at 5. Plaintiff also argues that Defendant's statements to authorities were false. *Id*.

### 1. Belief and Discretion

#### a. Belief

During her deposition, Defendant testified that she "honestly believe[d]" that Plaintiff had embezzled and that this belief was based upon: (1) Ash's statement; (2) the allegedly large number of checks written by Plaintiff; (3) the allegedly large number of cashed checks; (4) the opinion of the bookkeeper that Plaintiff had embezzled; and (5) that Plaintiff had "fled." Doc. #33-1 at 112.

In her response brief, Plaintiff argues that Defendant made "false accusations" to Pannell. Doc. #33 at 5. What Plaintiff does not do, however, is point to any *specific* false information

Defendant supplied to Pannell or that Defendant knew that such information was false.[9]  In the

absence of such an argument, the Court deems this point waived.  *See U.S. v. Dominguez–*

*Chavez*, 300 Fed. App'x 312, 313 (5th Cir. 2008) ("Dominguez has failed to adequately raise or

develop his due process and equal protection arguments in his appellate brief, and, thus, they are

waived."); *see also El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to

in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving

the court to put flesh on its bones.").

Even if the argument had not been waived, summary judgment on this point would still

be warranted.  At most, the evidentiary record reflects that Defendant provided three types of

information to the prosecuting authorities: (1) that she believed Plaintiff issued "several"

unauthorized checks; (2) financial information and copies of checks requested by Pannell; and

(3) "a detailed statement" of Plaintiff's employment duties.  Based at least in part on this

information, Pannell concluded that "according to [Defendant's] records" Plaintiff issued thirty-

nine "unauthorized" checks totaling $5,520.10.

Plaintiff has not cited, and this Court has been unable to find, any direct evidence of a

falsity, much less a knowing falsity, in any information Defendant provided to the authorities.

To find a knowing falsity from the record the Court would need to infer the requisite knowledge

---

[9] Elsewhere in her brief, Plaintiff cites to a December 17, 2014, affidavit of Tatum in which Tatum avers that "the information provided by [Defendant] was not sufficiently reliable to sustain a conviction against [Plaintiff] as it was inconsistent with her guilt."  Doc. #33-3 at ¶ 5.  In a subsequent affidavit, Tatum clarified that what she meant by this statement "was that the information, while sufficient to support a finding of probable cause …would be difficult to prove her guilt, beyond a reasonable doubt."  Doc. #34-1 at ¶ 14.  In light of this clarification, Tatum's first affidavit does not create a genuine issue of material fact as to the falsity of information provided by Defendant.  *See Texas Sales and Mktg., Inc. v. Distinctive Appliances, Inc*., No. H-05-3555, 2007 WL 399292, at *6 n.9 (S.D. Tex. Jan. 31, 2007) ("A court may consider … an affidavit supplementing or clarifying, rather than contradicting, prior sworn testimony when evaluating genuine issues in a motion for summary judgment.") (citing *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996)).  Similarly, the clarification, which relates to the strength of the information (not its veracity) does not support a finding of falsity, much less knowing falsity.

and falsity from the undisputed fact that Pannell identified some validly drawn checks as unauthorized. Such a finding would require a series of inferences, each less likely than the one preceding it. Specifically, the Court would need to infer that: (1) Pannell's misidentification of the valid checks as "unauthorized" was caused by information provided by Defendant; (2) the information provided by Defendant was false; and (3) Defendant knew that the information provided was false.

"While this Court must view the evidence in the light most favorable to the non-moving party and allow all reasonable inferences therefrom, [it should not] pile inference upon inference such that it crosses into speculation." *Rast v. Ryan's Rest. Grp., Inc.*, No. 1:10-cv-138, 2011 WL 4455247, at *9 (N.D. Miss. Sep. 23, 2011). Here, it is impossible to conclude that Defendant knowingly presented false information to Pannell (or anyone) without crossing over into improper speculation. Accordingly, the Court must conclude based on the summary judgment record that Defendant merely stated what she believed when she provided information to Pannell.

### b. Discretion

Having found that Defendant merely reported what she believed to Pannell, she will not be deemed an initiator of the criminal proceedings if the decision to prosecute was left to the discretion of the prosecuting authorities. The touchstone for discretion is whether the defendant's "desire to have the proceedings initiated was the determining factor in the official's decision to commence the prosecution." 52 Am. Jur. 2d Malicious Prosecution § 23. To this end, "it must [appear] that [the defendant's] desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution." Restatement (Second) of Torts § 653.

In considering whether discretion existed, a court will look at: (1) whether the private defendant submitted an affidavit supporting arrest; (2) the extent to which the private defendant influenced the arresting officer; and (3) the extent to which the private defendant influenced the district attorney. *See Smith v. Magnolia Lady, Inc*., 925 So.2d 898, 903 (Miss. Ct. App. 2006).

Here, there is absolutely no evidence that Defendant placed any pressure or made any request on either Tatum (the district attorney) or Pannell (the investigating officer) to institute the proceedings or that such a pressure or request was a determining factor in the decision to prosecute. To the contrary, Tatum offered an affidavit that she submitted the case to the grand jury based on "the best interest of justice." Doc. #34-1 at ¶ 8. And, it is beyond dispute that Defendant did not execute an affidavit charging Plaintiff with a crime. Under these circumstances, the Court must conclude that the decision to prosecute Plaintiff was left to the prosecuting authorities.

### 2. Summary

Because Defendant merely stated what she believed and left the decision to prosecute to the discretion to the authorities, she did not initiate the criminal proceeding. Accordingly, Defendant's motion for summary judgment must be granted.[10]

### B. Probable Cause

Even had Defendant initiated the proceeding, summary judgment would still be appropriate because Plaintiff has failed to show that Defendant lacked probable cause for such initiation.

---

[10] Having reached this conclusion, the Court need not consider whether Pannell conducted an "independent" investigation or whether Plaintiff was prosecuted for another offense.

As explained above, to sustain a malicious prosecution action, a plaintiff must show a "want of probable cause *for the proceeding*." *Moon*, 880 So.2d at 1042 (emphasis added). "Probable cause is determined from the facts apparent to the observer when prosecution is initiated." *Van v. Grand Casinos of Mississippi, Inc.*, 767 So.2d 1014, 1020 (Miss. 2000). Under this rule, "the existence of probable cause is to be judged in light of the facts as they appeared when the underlying action was filed." 54 C.J.S. Malicious Prosecution § 33 (citing *Willis v. Parker*, 814 So.2d 857 (Ala. 2001); *McLeod v. State ex rel. Dept. of Transp.*, 206 P.3d 956 (Mont. 2009)); *see also Reaves v. Westinghouse Elec. Corp.*, 683 F. Supp. 521, 524 (D. Md. 1988) (in action against private defendant, probable cause inquiry is based on knowledge "[a]t the time the criminal charges were filed").

Here, the relevant proceeding was a criminal prosecution for embezzlement of $5,520.10 in Ranch funds occurring between January 2009 and June 2009. "Embezzlement requires the wrongful appropriation or conversion of property where the original taking was lawful or with the consent of the owner." *Roberts v. State*, 960 So.2d 529, 533 (Miss. 2006) (internal quotation marks omitted); *see also* Miss. Code Ann. § 97-23-19. Accordingly, the Court must determine whether, on October 12, 2011—the day the indictment against Plaintiff was first filed—Defendant had probable cause to believe that Plaintiff had misappropriated the specified amount of Ranch property during the relevant time frame.

> To establish probable cause there must be a concurrence of (1) an honest belief in the guilt of the person accused and (2) reasonable grounds for such belief … When the facts are undisputed, it is the function of the court to determine whether or not probable cause existed. So long as the instigator of the action reasonably believed he had a good chance of establishing his case to the satisfaction of the court or the jury, he is said to have had probable cause.

*Van*, 767 So.2d at 1020 (internal citations, quotation marks, and punctuation omitted). "[A] malicious prosecution plaintiff bears the burden of production and persuasion of showing lack of probable cause ...." *Strong v. Nicholson*, 580 So.2d 1288, 1294–95 (Miss. 1991).

Here, Defendant argues that she had probable cause to initiate the criminal proceedings surrounding Plaintiff's alleged embezzlement based on: (1) Plaintiff's alleged prior embezzlement regarding the Disney tickets; (2) Plaintiff's unannounced departure; (3) Ash's statement to Defendant that Plaintiff had embezzled; (4) Defendant's "review of the books" with a bookkeeper; (5) Pannell's conclusion that Plaintiff had embezzled; and (6) the grand jury's return of the indictment for embezzlement. Doc. #28 at 15.

### 1. Alleged Prior Embezzlement

"In determining whether a person has probable cause for initiating criminal proceedings upon the facts known or reasonably believed by him to exist, the character of the accused as it is known or should be known to the accuser by reputation or experience is a highly important factor." Restatement (Second) of Torts § 662 (1977). Thus, Defendant's experience with Plaintiff is relevant to the extent such experience may serve as character evidence. *Id.*

In her response, Plaintiff argues that the alleged prior embezzlement regarding the Disney tickets cannot establish probable cause "because Maslon did not use this purchase as a basis for the indictment [and] Maslon gave Cardenas permission to use her PayPal account [for the purchase]." Doc. #33 at 7.

While Defendant testified that Plaintiff's use of the PayPal account for her Disney tickets was unauthorized, Plaintiff testified that Defendant gave her permission to make the purchase. Resolving this factual dispute in favor of Plaintiff, the Court concludes for purposes of summary judgment that Plaintiff was given authorization for the purchase and that, therefore, the purchase

could not form a reasonable belief that Plaintiff had previously embezzled. Under these circumstances, the Court deems the Disney purchase of no value to the probable cause inquiry.

### 2. Unannounced Departure

Plaintiff claims that her departure could not justify probable cause because she "explained in her deposition … that she [quit] because she was pregnant, and because she did not get along with [Defendant]." Doc. #33 at 7. Defendant replies that "[i]t is by no means a stretch of the imagination, under the circumstances, that Defendant could believe the unannounced abandonment of job and home by the Plaintiff in the summer of 2009 could have been precipitated by Plaintiff's concern that she would be caught embezzling from the ranch, for a second time." Doc. #34 at 8. Thus, Defendant seeks to establish the relevance of Plaintiff's departure by tying it to her alleged previous embezzlement. The Court rejects this argument for the same reason above, that is, because there is a genuine issue of material fact as to whether such embezzlement actually occurred.

### 3. Ash's Confession

Plaintiff argues that Ash's statement to Defendant cannot establish probable cause because: (1) Ash is "deceased, so there is no way to verify this allegation;" (2) Defendant "did nothing to investigate or confirm this allegation;" (3) Defendant "did not go through the 'suspicious' checks with Gene [Ash] so he could confirm that they were used during the course of this alleged scheme;" (4) Ash was not charged with embezzlement; (5) Ash was not called to testify before the grand jury; and (6) Defendant "took Ash at his word and with no follow up investigation, even though she knew that he was a 'serious' alcoholic.'" Doc. #33 at 7–8.

As an initial matter, Ash's death has no bearing on whether his statement to Defendant caused her to reasonably believe that Plaintiff embezzled from the Ranch. Thus, Plaintiff's first point is without merit.

Next, insofar as Defendant has introduced undisputed testimony that she hired a bookkeeper to help investigate Ash's accusation, Plaintiff's statement that Defendant did not investigate or confirm the allegation is simply untrue. Furthermore, insofar as courts have held confessions of co-conspirators sufficient to establish probable cause under a variety of circumstances, even if Defendant had not investigated Ash's statement, her lack of investigation would not preclude a finding of probable cause based on her reaction to Ash's confession of his part in the matter. *See Daniels v. City of Hartford*, 645 F.Supp.2d 1036, 1055 (M.D. Ala. 2009) ("[E]ven an uncorroborated statement of a co-conspirator can suffice to establish probable cause, so long as the confession is not 'outlandish on its face.'") (quoting *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997)); *see also Barnett v. U.S. Secret Serv.*, 273 F.3d 1095, at *1 (5th Cir. Sep. 4, 2001) (unpublished) ("The statements of Barnett's coconspirators were sufficiently detailed, corroborated each other, and included statements against penal interest, supporting a finding that the statements were reliable and establishing probable cause to seek an arrest warrant."); *Marquez v. Molinari*, 81 F.3d 169, at *2 (9th Cir. Apr. 3, 1996) (collecting cases for proposition that self-incriminating statements of con-conspirators are sufficient to establish probable cause in extradition hearing); *U.S. v. Roberts*, 274 F.3d 1007, 1016–17 (5th Cir. 2001) ("Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility-sufficient at least to support a finding of probable cause [to search]."). Thus, Plaintiff's second and third arguments, which relate to the extent of corroboration of Ash's confession, are rejected.

Next, Plaintiff cites to no authority and offers no argument as to how or why the decision not to prosecute Ash or call him before the grand jury has any bearing on the probable cause inquiry as it relates to Defendant. Thus, Plaintiff's fourth and fifth arguments are rejected.

Finally, the Court summarily rejects Plaintiff's contention that a declarant's known history of alcoholism prohibits a finding of probable cause based on his statements. *See Escalera v. Lunn,* 361 F.3d 737, 746 (2d Cir .2004) ("knowledge of a victim witness's criminal or psychiatric history, alone, is not enough to destroy probable cause"); *see also A.H. v. Gov't of Virgin Islands*, No. Crim.2005-64, 2006 WL 2405011, at *3 (D.V.I. Aug. 16, 2006) ("The fact that a person is a drug user does not preclude them from being considered a credible witness, especially when subsequent investigation confirms the witnesses statements.").

### 4. Review of the Books with Bookkeeper

Plaintiff argues that Defendant's investigation of the books with the bookkeeper cannot support probable cause because "absent from the record is any evidence that the [inspection] was ever done, and Maslon claims to not even remember the name of this phantom bookkeeper." Doc. #33 at 8. Contrary to Plaintiff's argument, there is evidence that Defendant went through her books with her bookkeeper – Defendant's recounting of the event in her affidavit, which Plaintiff has not negated with contrary evidence. Doc. #27-6 at ¶ 26; Furthermore, the portion of the deposition Plaintiff cites regarding Defendant's inability to name the bookkeeper appears to relate to her now-deceased bookkeeper, not the person who analyzed the books following Ash's confession. Even if the portion of the deposition related to the relevant bookkeeper, Plaintiff's counsel explicitly declined Defendant's offer to provide the requested name. Doc. #33-1 at 26–27. Under these circumstances, the Court deems Plaintiff's objections to Defendant's testimony to be without merit.

### 5. Pannell's Conclusions

Plaintiff contends that Pannell's determination of embezzlement cannot support a finding of probable cause because Pannell "relied upon Maslon for all of [his] evidence, and the evidence she did supply, later turned out to be so unreliable that it lead [sic] to a dismissal of this case on the merits." Doc. #33 at 8.

To be sure, where a defendant is the "ultimate source" of all an investigator's information, she may not argue "that there was probable cause because the investigator … believed she had a good case against [the plaintiff]." *Hammack v. Czaja*, 769 So.2d 847, 853 (Miss. Ct. App. 2000). However, Plaintiff, who bears the burden of showing a want of probable cause, has introduced absolutely no evidence that Pannell relied solely upon evidence provided by Defendant. Indeed, Plaintiff introduced no evidence as to the scope or nature of Pannell's investigation. This failure to produce any evidence is fatal to Plaintiff's "ultimate source" argument. *See Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 391 (5th Cir. 2009) ("This court will not assume … in the absence of any proof, that the nonmoving party could or would prove the necessary facts.").

As to the ultimate dismissal of the action, insofar as the information supporting the dismissal did not occur until after the indictment, it is of no value to the probable cause inquiry, which is limited to the point of initiation of criminal proceedings. *Van*, 767 So.2d at 1020.

### 6. Return of Indictment

"The Mississippi Court of Appeals recently opined that under Mississippi law, the existence of an indictment does not conclusively establish probable cause but rather is prima facie evidence of probable cause, which may be contradicted by evidence of significant irregularities in the grand jury proceedings." *Delaney v. Mississippi Dep't of Pub. Safety*, No.

3:12-cv-229, 2013 WL 286365, at *10 (S.D. Miss. Jan. 24, 2013), *aff'd*, 554 F. App'x 279 (5th Cir. 2014) (citing *Springfield v. Members 1st Cmty. Fed. Credit Union*, 106 So.3d 826, 830 (Miss. Ct. App. 2012)). Significant irregularities in the grand jury proceeding may, in turn, be shown by establishing "that the indictment was obtained by failing to make a full and complete statement of facts to the grand jury or district attorney, by the withholding of information by the prosecutor which might have affected the result, or by showing that the indictment was produced by the misconduct of the party seeking indictment." *Springfield*, 106 So.3d at 830–31 (quoting 54 C.J.S. Malicious Prosecution § 48).

Plaintiff argues that there were significant irregularities in the grand jury proceedings because:

> (1) Maslon presented unreliable evidence to the investigator, district attorney and grand jury which lead [sic] to dismissal of the charges; (2) She failed to investigate any of the allegations supposedly made by Gene Ash; (3) She failed to investigate any of the circumstances of the 39 "suspicious" checks presented to the grand jury; and (4) She admits that she had no actual evidence that any of the 39 checks were fraudulent, they were just suspicious to her.

Doc. #33 at 10.

### a. Failure to Make a Full and Complete Statement of Facts

As explained above, a plaintiff may rebut the prima facie evidence of probable cause raised by a grand jury indictment by showing "that the indictment was obtained by failing to make a full and complete statement of facts to the grand jury or district attorney." *Springfield*, 106 So.3d at 830–31 (quoting 54 C.J.S. Malicious Prosecution § 48). However, neither *Springfield* nor Corpus Juris Secundum define a "full and complete statement of facts."

The provision of Corpus Juris Secundum cited by *Springfield* cites two cases for the "full and complete" rule: (1) *Fort Wayne Mortgage Company v. Carletos*, 291 N.W.2d 193 (Mich. Ct. App. 1980); and (2) *Sital v. City of New York*, 60 A.D.3d 465 (N.Y. Ct. App. 2009). 54 C.J.S.

Malicious Prosecution § 48. Both cases relate to the intentional withholding of information during the grand jury process. *See Fort Wayne*, 291 N.W.2d at 195 (probable cause rebutted "[i]n those cases wherein it is alleged that the individual or entity which instituted the proceedings had actual knowledge of all the material facts but engaged in selective disclosure of only inculpatory information …."); *see also Sital*, 60 A.D.3d at 466 (probable cause presumption rebutted because "the jury could have rationally concluded that the investigating officer, who did not alert the prosecutor to the statement by another witness, which was inconsistent with the statement given by the individual who accused plaintiff, and arguably implicated that individual in the shooting, failed to make a complete and full statement of facts to the District Attorney."). This notion of selective disclosure is reflected in the Restatement, which notes that evidence of an indictment may be "refuted" if the plaintiff shows that the indictment was obtained "by false testimony offered by the prosecutor or given in his behalf, *or by his withholding of material evidence known to him*." Restatement (Second) of Torts § 663 (emphasis added).[11]

Based on the above authorities, the Court concludes that a grand jury or prosecutor does not receive a full and complete statement of facts when known material information has been withheld. In the present case, Plaintiff has offered no evidence that known material information (or indeed any information) was withheld from either Tatum or the grand jury. Accordingly, Plaintiff has not shown that Tatum or the grand jury did not receive a full and complete statement of facts.

---

[11] While § 663 deals with commitments by magistrates, the provision of the Restatement relating to grand jury indictments provides that "[a]lthough the indictment is evidence of probable cause, it may be explained by evidence of the same general nature as that discussed in the Comments under § 663, which are applicable to the rule here stated so far as they are pertinent." Restatement (Second) of Torts § 664.

### b. Withholding of Information by Prosecutor

Plaintiff does not allege, and no evidence supports the conclusion that, Tatum withheld information from the grand jury.

### c. Misconduct by Defendant

To rebut the presumption based on misconduct by a defendant, a plaintiff must show: (1) misconduct; and (2) that the misconduct "produced" the indictment. *Springfield*, 106 So.3d at 830–31. Here, Plaintiff's allegations of Defendant's misconduct may be summarized as: (1) providing "unreliable" information; (2) failing to investigate Ash's confession; (3) failing to investigate the checks Pannell identified as suspicious; and (4) basing her allegations on suspicions.

First, as explained above, Tatum's statement about the reliability of the information supplied by Defendant related only to the likelihood the evidence could support a conviction, not the information's veracity or its ability to create probable cause. There is no evidence that Defendant provided false information or that, even if she provided false information, she did so intentionally. Thus, Plaintiff has not shown that Defendant's provision of information to the authorities amounts to any type of misconduct.

Next, it is undisputed that Defendant investigated Ash's confession by hiring a bookkeeper and reviewing her books. Plaintiff's contention that Defendant did not investigate the confession is therefore without merit.

Third, Plaintiff has cited no authority, and this Court has been unable to find any, which would support the proposition that Defendant's failure to confirm the conclusions of a trained police investigator constituted misconduct.

Finally, the evidence indicates that Defendant did not base her allegations on suspicion alone.  Rather, she determined that, based on Ash's confession and the circumstances of certain checks, it was likely Plaintiff had embezzled money.  Such a conclusion is not misconduct.  *See Williams v. State*, 122 So.3d 105, 108-09 (Miss. Ct. App. 2013) ("[A] conviction may be had on circumstantial evidence alone.").

### d.  Summary

Plaintiff was indicted for embezzlement by a grand jury and has not shown that the indictment was based on significant irregularities.  Accordingly, the indictment serves as prima facie evidence of probable cause.  *Delaney*, 2013 WL 286365, at *10.

### 7.  Existence of Probable Cause

At the time the criminal proceedings were instituted, the evidence indicates Defendant knew or reasonably believed that: (1) Ash had confessed to a joint embezzlement scheme with Plaintiff and a subsequent review of her books revealed more than $10,000 in undocumented checks; (2) Pannell stated that he believed Plaintiff had embezzled $5,520.10 from Defendant; and (3) a grand jury determined there was probable cause to believe that Plaintiff had embezzled $5,520.10 from Defendant.  Standing alone, any one of these circumstances would likely be sufficient to support a finding of probable cause.  Taken together, the circumstances more than justify a reasonable and honest belief that Plaintiff misappropriated $5,520.10 of funds of which she had been entrusted.[12]  *See Coleman v. Smith*, 914 So.2d 807, 812 (Miss. Ct. App. 2005) (probable cause existed based on confession of co-conspirators and independent investigation);

---

[12] In reaching this conclusion, the Court rejects Plaintiff's argument that probable cause is negated by the fact that "[a]fter [Cardenas] quit working for the ranch, Maslon told her that she had reviewed the business account and they looked great."  Doc. #33 at 7.  Insofar as this statement was made before the Ash confession and subsequent investigation, it has no bearing on the reasonableness of Defendant's belief at the time the criminal prosecution was initiated.

*see also Funderburk v. Johnson*, 935 So.2d 1084, 1099 (Miss. Ct. App. 2006) (defendant had probable cause to initiate embezzlement prosecution against bookkeeper where retained "accountants concluded that the person who performed the bookkeeping functions … was responsible for the shortages ….").

### C.   Remaining Contentions

Having found that summary judgment is appropriate on either the institution or probable cause elements of Plaintiff's malicious prosecution case, the Court need not consider whether the prior proceedings were terminated in Plaintiff's favor or whether Defendant acted with malice.

**IV**
**<u>Conclusion</u>**

For the reasons above, Defendant's motion for summary judgment [27] is **GRANTED**.


SO ORDERED, this 17th day of March, 2015.

**/s/ Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**
